Filed 6/22/21  P. v. Clark CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B304613 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA467673) |
| v. | |
| JOE WILLIE CLARK, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Laura F. Priver, Judge.  Affirmed.

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithy, Assistant Attorney General, Wyatt E. Bloomfield and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted appellant, Joe Willie Clark, of second degree murder in violation of Penal Code section 187, subdivision (a)[1] and found true that appellant personally discharged a firearm causing death as alleged under section 12022.53, subdivision (d).  The jury also convicted appellant of illegal possession of a firearm by a felon in violation of section 29800, subdivision (a)(1).  The trial court sentenced appellant to a term of 15 years to life for the second degree murder conviction and a consecutive term of 25 years to life for the gun enhancement.  Appellant filed a timely notice of appeal.

On appeal, appellant contends:  (1) the trial court improperly restricted appellant's expert witness's testimony on the effect of Post Traumatic Stress Disorder (PTSD) at the time of the shooting in violation of his federal and state constitutional rights to present a defense; (2) the trial court's imposition of a consecutive term of 25 to life for the gun enhancement under section 12022.53, subdivision (d) violated the Double Jeopardy Clause of the Fifth Amendment of the federal Constitution as an improper multiple punishment; and (3) the trial court's imposition of the restitution fine of $300 pursuant to section 1202.4, subdivision (b) and $7,007.30 for victim restitution pursuant to section 1202.4, subdivision (f) were the result of invalid waivers and were unconstitutionally excessive in violation of the Eighth and Fourteenth Amendments.  We affirm the judgment.

---

[1]     Unless otherwise indicated, all further section references are to the Penal Code.

# FACTUAL AND PROCEDURAL BACKGROUND

## *Prosecution's Case*

On April 28, 2018 around 7:00 p.m., Damecia M. was in her SUV alone behind the driver's seat waiting for the gate to open so she could enter the parking area at an apartment building called the Renato. The Renato is a low-income housing apartment building located in the "skid row" area of downtown Los Angeles. Damecia M. was visiting her mother who lived there. She observed a "heated" argument between the victim, Toby Lacy, and appellant near her car. Both men were moving their hands while they argued, but neither attempted to hit the other. While Damecia M. was looking at her phone, she heard a single gunshot. She observed Lacy walking towards the gate at the Renato and fall to the ground. Damecia M. observed appellant walk past her car putting the gun away, which she described as a small handgun, and enter the Renato out of sight. Damecia M. called 911.

Surveillance video from the Renato captured appellant go up to the roof of the apartment building. Later, when the police searched for evidence, a revolver was found on the roof near where appellant was captured on the surveillance video.

When officers from the Los Angeles Police Department arrived at the Renato, they found Lacy on the ground unresponsive. The coroner determined that Lacy died from a single gunshot wound to his chest. A bullet was recovered from Lacy's body. The revolver found on the roof was test fired and compared to the bullet extracted from Lacy's body. The result showed the revolver fired the fatal shot.

*Appellant's Case*

Nathan Peterson who worked as a janitor at the Renato testified that he and appellant were childhood friends whose friendship became closer when appellant moved in at the Renato. Peterson recognized Lacy as a person who stayed in the unit across from appellant's unit. A few months before the shooting, he noticed that appellant had a gash over his eye. Appellant said he was jumped by two guys – one of them was Lacy. After observing the gash over the eye, Peterson noticed that appellant acted differently by "looking out the door, and he's doing this way and this way and shutting his door." He appeared shaken by the incident.

Another childhood friend, Anthony Parker testified that about a week before the shooting, appellant asked Parker to accompany him to retrieve an item from his apartment at the Renato because he was having trouble with his neighbor and that he was afraid of him.

Appellant's cousin, Mark M. testified that appellant was raised by his grandmother in South Central Los Angeles in a very violent neighborhood. He and appellant remained close and the two would visit each other in the San Fernando Valley (Valley) where Mark M. lived, and also in downtown Los Angeles, where appellant lived. Mark M. noticed a difference in appellant's demeanor in the Valley, where he was relaxed, and, in downtown, where he "look[ed] over his shoulder."

Appellant testified that he grew up in South Central Los Angeles raised by his grandmother. He was shot at five times between 1986 to 2005. Appellant experienced flashbacks of these shootings triggered by watching T.V., or, by things that "happen[ed] outside." He had been staying at the Renato for

4

about six years.  Renato is in the "skid row" area of downtown Los Angeles.  Appellant felt safe in his apartment but not safe outside.

Appellant suffered from depression for which he received treatment at a clinic.  He felt downtown Los Angeles was dangerous and wanted to get away.

Appellant knew Lacy was a guest staying in the apartment across the hall from his apartment.  On several occasions, Lacy wanted appellant to let him into the building but appellant refused based on the "house" rule that a resident was required to sign the guest into the building, and, Lacy was not appellant's guest.  Lacy was upset at appellant for not letting him into the building, and, over time, became more and more upset.  Lacy would call appellant names such as "fag," "bitch," "moron," and "cripple."  This began sometime in 2016 and continued until the incident.

Lacy threatened appellant three times, and on the last one, Lacy, and Lacy's brother, Andre, physically assaulted him.  The assault happened several months before the incident.  After the assault, appellant was "really afraid of this guy" because "he made good on his threat, he let me know he could do harm to me."  After this incident, appellant tried to avoid Lacy but still ran into him numerous times.  Lacy verbally harassed appellant each time.

Appellant testified that out of fear for his life, in January 2018, he armed himself with a handgun for protection.

On the day of the incident, appellant had gone to a corner store to buy junk food and was standing near the front of the Renato.  Lacy approached appellant approximately two to three feet away, angry.  Appellant told Lacy to leave him alone, but

5

Lacy continued to harass him. Lacy appeared to become angrier. Appellant pulled the handgun and told Lacy to leave him alone. Lacy continued to advance. Appellant shot Lacy when he was inches away. Appellant hid the gun on the roof of the Renato.

Dr. Kevin Booker, a certified trauma specialist testified about appellant's diagnosis for PTSD. He holds a doctorate degree from the University of California, Santa Barbara. Booker interviewed appellant on three occasions. Booker testified that individuals suffering from PTSD experience several symptoms - they re-experience the trauma such as flashbacks, they attempt to avoid memories and reminders of the traumatic event – and they become hyperaware of their surroundings. Booker diagnosed appellant as suffering from moderate to severe PTSD. Booker explained that a person who is a victim of gunshot manifests symptoms of PTSD to include hyperarousal. A person exhibits hyperarousal when the heightened awareness of something happening causes an overreaction. Booker testified that appellant suffered from PTSD at the time he was involved in the incident.

## DISCUSSION

### I.  Testimony of the Defense Expert

Appellant contends the trial court improperly restricted the defense expert's testimony about the effect of PTSD on appellant's state of mind at the time of the shooting in violation of his federal constitutional right under the Fourteenth Amendment and his state constitutional right under article I, section 15. We disagree.

### A.  Legal Principles

Under the California Penal Code, the restrictions on the scope of expert witness's testimony on the accused's mental state

are governed by sections 28 and 29.  Section 28, subdivision (a) states in relevant part, "Evidence of mental disease, mental defect, or mental disorder *shall not be admitted to show or negate the capacity to form any mental state*, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act." (Italics added.)  Section 29 provides in part, "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect *shall not testify as to whether the defendant had or did not have the required mental states*, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged." (Italics added.)[2]  Together, sections 28 and 29 stand for the combined rule that in a criminal trial, an expert witness who testifies about the accused's mental condition may not:  (1) testify that the accused did not have the capacity to form a particular mental state, and (2) testify that at the time of the alleged incident, the accused harbored or did not harbor the required mental state.  "The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."  (§ 29.)

---

[2]     The third rule, not relevant in this appeal, is section 25 which abolished the defense of diminished capacity.  (§ 25, subd. (a) ["The defense of diminished capacity is hereby abolished.  In a criminal action, as well as any juvenile court proceeding, evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged."].)

7

The limits of sections 28 and 29 in relation to permissible defense expert testimony on the accused's mental condition were explained in *People v Coddington* (2000) 23 Cal.4th 529 (*Coddington*), overruled on another ground by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, footnote 13.  *Coddington* noted, "Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state. An expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence *vel non* of the mental states of premeditation and deliberation regardless of whether the expert believed appellant actually harbored those mental states at the time of the killing."  (*Id*. at p. 582, fns. omitted.)  *Coddington* further explained that, "Sections 28 and 29 do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense.  They preclude only expert opinion that the element was not present."  (*Id*. at p. 583.)

In *People v. Herrera* (2016) 247 Cal.App.4th 467 (*Herrera*), the Court of Appeal reversed a judgment based on a trial court's order limiting the defense expert witness from testifying about the defendant's mental condition at the time of the offense.  The *Herrera* court relied on *Coddington* and on another Court of Appeal opinion – *People v. Cortes* (2011) 192 Cal.App.4th 873  – in reaching its conclusion.

In *Herrera*, "[d]efense counsel asked [the defendant's expert witness] if she had an opinion 'as to whether [the defendant] was

8

suffering from [peritraumatic dissociative state],' 'whether he was psychiatrically impaired,' and 'whether he suffered from [PTSD]' on the date of the murder.  The prosecutor objected to all three questions.  The trial court sustained the objections 'based on what we talked about earlier.' " (*Herrera, supra,* 247 Cal.App.4th at p. 475.)

The *Herrera* court held that this limitation placed by the trial court was more restrictive than what sections 28 and 29 prohibit.  (*Herrera, supra,* 247 Cal.App.4th at p. 478.)  The court explained, "[t]aken together, these sections 'do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense.  They preclude only expert opinion that the element was not present.' [Citation.]  'Put differently, sections 28 and 29 do not prevent the defendant from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged.' [Citation.]" (*Id.* at p. 476.)

On the question of the proper standard of review, appellant cites *Herrera* and contends we must independently review the trial court's decision because of his constitutional right to present a defense.  In *People v. Fudge* (1994) 7 Cal.4th 1075, the California Supreme Court noted, "[a]s a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.]  Although completely excluding evidence of

9

an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.]" (*Id.* at pp. 1102-1103.) Here, if error occurred, restricting the evidence that potentially reduces or negates the mental state required to prove the crime of murder was not a "minor" or a "subsidiary point." Therefore, as in *Herrera*, we shall apply independent review to this " 'mixed question determinations affecting constitutional rights.' " (*People v. Seijas* (2005) 36 Cal.4th 291, 304.)

When applying independent review, we assess prejudice using the *Chapman* standard. (*Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).) "Under *Chapman*, a federal constitutional error is harmless when the reviewing court determines 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] When there is ' "a reasonable possibility" ' that the error might have contributed to the verdict, reversal is required. [Citation.]" (*People v. Aranda* (2012) 55 Cal.4th 342, 367.)

## B.     Analysis

At the motion in limine to determine the scope of permissible testimony for Dr. Booker, the trial court ruled, defense expert cannot testify to anything that would be the ultimate issue at trial, such as whether or not the defendant could have the – form the particular intent. That includes through any hypothetical. Hypotheticals can't be formulated which would have the expert opine that a defendant either actually formed or could not form the specific intent or a particular intent."

10

Appellant claims this ruling by the trial court precluded Dr. Booker from testifying that he was suffering from PTSD at the time he shot Lacy. Appellant relies heavily on *Herrera* to draw a similar comparison. The rulings between the two cases, however, are not similar.

In *Herrera*, the trial court ruled that the defense expert would be allowed to " 'testify as to various aspects of [PTSD], as to testing and things of that nature, but not anything related to mental state at the time of the commission of the offense.' " (*Herrera, supra*, 247 Cal.App.4th at p. 474-475.) On the contrary, the trial court here did not restrict appellant's trial counsel from asking questions about appellant's mental state at the time of the shooting. Rather, the trial court's ruling is consistent with the limits based on section 28 - whether appellant could form the particular intent - and section 29 – whether appellant actually formed the specific intent or mental state.[3] While the words used by the trial court differed from the statutory language, they conveyed the same limits within sections 28 and 29 and nothing more. The trial court's ruling was consistent with sections 28 and 29. There was no error.

In any event, Dr. Booker ultimately testified about appellant's state of mind at the time of the incident through

---

[3] Indeed, the bigger issue appeared to be the hearsay problem of having Dr. Booker testify to case-specific facts (how the appellant was shot at five times to establish traumatic events as foundation for PTSD) as discussed in *People v. Sanchez* (2016) 63 Cal.4th 665. While we have no way of knowing why the appellant decided to testify, laying the case-specific foundation to establish the underlying traumatic event is certainly a plausible reason.

cross-examination by the prosecutor. To show the jury Dr. Booker could not know whether appellant acted under the stress of PTSD at the time of the shooting, the prosecutor asked:

"[The Prosecutor:] You weren't there when the [appellant] actually shot the victim in the case, obviously; right?
"[Dr. Booker:] Of course not, no.
"[The Prosecutor:] So you didn't have the – – you weren't able to observe his demeanor or his expression during the actual shooting; correct?
"[Dr. Booker:] That's correct.
"[The Prosecutor:] You couldn't hear the tone of his voice when he pointed the gun at somebody for, you know, ten seconds; correct?
"[Dr. Booker:] No sir.
"[The Prosecutor:] So you cannot tell this jury with any certainty that the [appellant] had a PTSD episode at that moment. All you can tell them is that it's possible that he could have based on your evaluation a year later.

Dr. Booker took issues with the concept of an "episode." He told the jury that PTSD is not characterized as being experienced in episodes but rather, that a person who suffers from PTSD "have it, and it doesn't go away. So it doesn't selectively or intermittently present itself. Once it's there, it's there. [¶] So again, my statement is that I can tell the jury that, yes, [appellant] did have PTSD at the time he was involved in this case." Unlike *Herrera* where the defendant's expert never testified about whether the defendant was suffering from PTSD at the time of the killing, here, the direct opposite occurred. Dr.

Booker informed the jury that at the time of the shooting, appellant suffered from PTSD.

The record shows that the jury was informed that: (1) appellant grew up in a high crime area; (2) appellant was shot at five times from 1986 to 2005; (3) appellant suffered from flashbacks about these shootings; (4) appellant's numerous encounters with Lacy caused him nervousness and fear; (5) the beating by Lacy and Andre several months before the shooting caused appellant to fear for his physical safety; (6) after three interviews and testing, Dr. Booker diagnosed appellant as suffering from moderate to severe PTSD, (7) Dr. Booker did not believe that appellant was malingering, (8) Dr. Booker reviewed medical reports from when appellant was shot; (9) psychological trauma is a response human beings exhibit after experiencing a life-threatening situation; (10) psychological trauma can lead to a host of symptoms that includes a significant preoccupation with safety that activates the fear circuitry; (11) when the fear circuitry is activated, one of the symptoms is the involuntary "fight or flight" reaction which triggers four potential outcomes (flight/fight/freeze/faint); (12) re-encountering the assailant who previously caused a traumatic event increases the activation of the fear circuitry; (13) a person who undergoes a qualifying traumatic event can develop PTSD; (14) symptoms of PTSD include flashbacks, avoidance, and hyperarousal; (15) length of time from when a person suffers a qualifying traumatic event does not determine whether someone continues to suffer from PTSD; and (16) hyperarousal, or hypervigilance, can lead to overreaction to the stress causing event.

We note again that the trial court's ruling limiting Dr. Booker's testimony was consistent with sections 28 and 29. As

the Attorney General posits, however, even if there was error, such error – even under the *Chapman* standard – was not prejudicial.

The evidence that appellant suffered from PTSD at the time of the shooting was ultimately received by the jury through cross-examination by the prosecutor. When that piece of evidence is combined with all other evidence presented to the jury as categorized above, the jury received what appears to be the totality of relevant admissible evidence to negate or reduce the mens rea for murder liability. Moreover, the jury received evidence that appellant was angry at Lacy, and, hated him. Appellant testified he knew Lacy had no weapons in his hands at the time of the shooting. Instead of calling 911 to explain what happened, appellant sought to get rid of the gun and unsuccessfully attempted to hide it on the roof of the Renato. Once at the rooftop, appellant hid in the doorway for a few minutes to make sure no one was on the roof before going out. Given this set of evidence, there was no reasonable possibility that the alleged error contributed to the verdict. If any error occurred, such error was harmless beyond a reasonable doubt.

## II.     Double Jeopardy Claim

Appellant next contends the trial court's imposition of a consecutive term of 25 to life for the gun enhancement under section 12022.53, subdivision (d) violated the Double Jeopardy Clause of the Fifth Amendment as an improper multiple punishment. We disagree.

## A.     Legal Principles

The United States Supreme Court has explained that the Double Jeopardy Clause of the Fifth Amendment "protects against a second prosecution for the same offense after acquittal.

14

It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." (*North Carolina v. Pearce* (1969) 395 U.S. 711, 717, fns. omitted.)

On "multiple punishment for the same offense," *Jones v. Thomas* (1989) 491 U.S. 376 is instructive. The high court explained, "Our cases establish that in the multiple punishments context, that interest is 'limited to ensuring that the total punishment did not exceed that authorized by the legislature.' [Citations.] The purpose is to ensure that sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments. [Citation.] In this case, respondent's conviction of both felony murder and attempted robbery gave rise to a double jeopardy claim only because the Missouri Legislature did not intend to allow conviction and punishment for *both* felony murder and the underlying felony. [Citations.]" (*Id.* at p. 381.) Stated differently, "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." (*Missouri v. Hunter* (1983) 459 U.S. 359, 366.)

## B.    Analysis

As the high court's decisions make clear, when assessing a double jeopardy claim under the category of "multiple punishments," we look to legislative intent. Appellant accurately posits the pertinent question – "[t]he issue is whether, when the crime is murder, the Legislature intended to further increase the penalty because the defendant's act resulted in death."

Before we delve into the double jeopardy analysis, a short discussion of related rules is appropriate, namely the rule prohibiting multiple convictions based on necessarily included offenses, and, the rule against multiple punishment under section 654.

In California, the rule against multiple convictions, if the accused is convicted of both a greater offense and a necessarily included lesser offense, is longstanding. When this occurs, the conviction of the lesser offense is unlawful and must be reversed. (*People v. Pearson* (1986) 42 Cal.3d 351, 355, overruled on other grounds by *People v. Vidana* (2016) 1 Cal.5th 632, 650; *People v. Cole* (1982) 31 Cal.3d 568, 582; *People v. Moran* (1970) 1 Cal.3d 755, 763; *People v. Bauer* (1969) 1 Cal.3d 368, 375; *People v. Greer* (1947) 30 Cal.2d 589, 604, overruled on another ground by *People v. Fields* (1996) 13 Cal.4th 289, 308, fn. 6.) In *People v. Izaguirre* (2007) 42 Cal.4th 126 (*Izaguirre*), the California Supreme Court held that sections 12022.5 and 12022.53 were not elements of a crime for purposes of the multiple conviction rule. *Izaguirre* did not squarely address the double jeopardy issue on multiple punishments.

Section 654, subdivision (a) states, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

In *People v. Palacios* (2007) 41 Cal.4th 720 (*Palacios*), the appellant was "convicted of attempted premeditated murder (§§ 187, subd. (a), 664, subd. (a)); kidnapping for robbery (§ 209,

subd. (b)(1)); kidnapping for carjacking (§ 209.5, subd. (a)); carjacking (§ 215, subd. (a)); and robbery (§ 211).  The jury found that defendant discharged a firearm and personally inflicted great bodily injury when committing these offenses.  (§§ 12022.53, subd. (d), 12022.7, subd. (a).)  Defendant was also convicted of assault involving personal use of a firearm.  (§§ 245, subd. (a)(2), 12022.5, subd. (a).)" (*Id.* at p. 724.)  The trial court imposed three 25-to-life terms based on the section 12022.53, subdivision (d) findings on the attempted murder and the two kidnapping convictions.  The appellant claimed section 654 prohibited the trial court's multiple impositions of the gun enhancement because "he fired one shot at a single victim." (*Palacios,* at p. 725.)

The *Palacios* court rejected this argument.  The court explained that the legislative intent behind section 12022.53 was clear:  " ' "The Legislature finds and declares that substantially longer prison sentences must be imposed on felons whose use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crimes." ' " (*Palacios, supra,* 41 Cal.4th at p. 725.)  In resolving the contention, the *Palacios* court held, "We are persuaded that, in enacting section 12022.53, the Legislature made clear that it intended to create a sentencing scheme unfettered by section 654." (*Id.* at pp. 727-728.)  While *Izaguirre* and *Palacios* are helpful in analyzing appellant's contention, neither case is directly on point.

Appellant's argument is, however, very similar to a section 654 contention.  This is so because he frames the issue applicable only to murder convictions.  Appellant asks a rhetorical question – "If the Legislature passed a law providing for enhanced punishment for all murder that causes a death, would that law

17

punish the same act more than once?" But the issue he raises is a violation of the Double Jeopardy Clause of the Fifth Amendment within the category of multiple punishments. Here, we look to determine whether the Legislature prohibits the multiple punishment in question.

"The fundamental task of statutory construction is to 'ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute.' [Citation.] The words of a statute are to be interpreted in the sense in which they would have been understood at the time of the enactment. [Citations.]" (*People v. Cruz* (1996) 13 Cal.4th 764, 774-775.) We consider the language used in a statute as " 'generally is the most reliable indicator of legislative intent.' " (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.) The plain meaning controls absent ambiguity in the statutory language. (*Ibid*.)

Section 12022.53, subdivision (d) provides, "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

" 'By definition, a sentence enhancement is "an additional term of imprisonment added to the base term." ' [Citations.]" (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1124.) As such, the plain reading of the statute shows, any person who is convicted of an offense specified in section 12022.53, subdivision (a) is to be

18

punished with a consecutive term of 25 to life. Subdivision (a) enumerates the offenses to which this enhancement applies. On this list of qualifying crimes, the crime of murder as defined under section 187 is at the very top. (§ 12022.53, subd. (a)(1).)

It is true the California Legislature softened the mandatory nature of imposing section 12022.53 enhancements under Senate Bill No. 620 (2017-2018 Reg. Sess.) by permitting a trial court to "strike or dismiss an enhancement otherwise required to be imposed by this section" under section 1385. (§ 12022.53, subd. (h).) Despite this amendment, this section still requires that "probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, any person found to come within the provisions of this section." (*Id.*, subd. (g).) From our reading of the statute, it is clear the Legislature has not prohibited the imposition of consecutive terms when a person is convicted of murder and the section 12022.53, subdivision (d) enhancement is found true. There is no double jeopardy problem under the Fifth Amendment.

## III. Restitution Fine/Victim Restitution Contention

Appellant contends the restitution fine and victim restitution orders were the result of invalid waivers and were unconstitutionally excessive in violation of the Eighth and the Fourteenth Amendments of the federal Constitution. We disagree.

## A. Legal Principles

In California's appellate landscape, there currently exist two alternate methods for raising a claim that a trial court's imposition of fines and fees at sentencing is unconstitutional: (1) a violation of the due process clause as discussed in *People v. Dueñas* (2019) 30 Cal.App.5th 1157; and (2) a violation of the

Excessive Fines Clause as discussed in *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, and *People v. Aviles* (2019) 39 Cal.App.5th 1055. Appellant raises his constitutional challenge to the imposition of the restitution fine and the direct victim restitution order under the Eighth Amendment's proscription against the imposition of excessive fines rather than under the umbrella of due process.[4]

The Eighth Amendment protects against the imposition of excessive fines. (U.S. Const. 8th Amend.) "[T]he word 'fine' was understood to mean a payment to a sovereign as punishment for some offense." (*Browning–Ferris Industries v. Kelco Disposal, Inc.* (1989) 492 U.S. 257, 265 (*Browning-Ferris*).) The *Browning-Ferris* court reviewed the relevant history of English law and concluded that the Framers of the Bill of Rights intended the Excessive Fines Clause as "limiting the ability of the sovereign to use its prosecutorial power, including the power to collect fines, for improper ends." (*Id.* at p. 267.) "[T]he history of the Eighth Amendment convinces us that the Excessive Fines Clause was intended to limit only those fines directly imposed by, and payable to, the government." (*Id.* at p. 268.) "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." (*United States v. Bajakajian* (1998) 524 U.S. 321, 334 (*Bajakajian*).)

Based on *Bajakajian*, California courts apply a four-part analysis when confronted with an excessive fine claim under the Eighth Amendment: "(1) the defendant's culpability; (2) the

---

[4] The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (U.S. Const., 8th Amend.)

relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay." (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728.)

## B.     Analysis

At the time of sentencing, the trial court imposed a restitution fine pursuant to section 1202.4, subdivision (b) in the amount of $300. The trial court also imposed direct victim restitution to be paid to the Victim Compensation Board in the amount of $7,007.30. Appellant claims both orders violated his constitutional rights against excessive fines under the Eighth Amendment. We review each in turn.

## 1.     Section 1202.4, subdivision (b) Order

As noted *ante*, the trial court imposed the mandatory minimum fine of $300 under section 1202.4, subdivision (b) for a felony conviction. (§ 1202.4, subd. (b)(1).) Under section 1202.4, subdivision (c), "A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)." (*Id.*, subd. (c).) Based on the mandatory nature of imposing the minimum amount of restitution fine under this subdivision, "[c]ourts have generally declined to apply the forfeiture doctrine where the minimum restitution fine was imposed because the statute expressly precludes objection in that circumstance. [Citations.]" (*People v. Montes* (2021) 59 Cal.App.5th 1107, 1115-1116.) We shall do the same.

We find that the trial court's imposition of the $300 restitution fine was not grossly disproportionate to appellant's

conviction for Lacy's murder. Although appellant stood convicted of murder, one of the most serious of crimes under the California's penal code, the trial court only imposed the mandatory minimum amount. Although appellant contested the mental state required as an element of the crime of murder, there was no question appellant shot and killed Lacy. As the Attorney General notes, nothing in the record suggests appellant would not be able to pay the minimum amount as ordered by the trial court. The probation officer's report showed that he had lived at the Renato for five years and was employed at the time he shot Lacy. Nothing suggests he will not be able to perform some labor while in the prison system. The imposition of the restitution fine pursuant to section 1202.4, subdivision (b) was not excessive in violation of the Eighth Amendment.

## 2. Section 1202.4, subdivision (f) Order

To apply the Excessive Fines Clause to direct victim restitution under section 1202.4, subdivision (f), appellant must show that the restitution payment is a "fine" that is paid to a "sovereign." (*Browning–Ferris, supra*, 492 U.S. at p. 268.)

In California, direct victim restitution is a state constitutional right. Article I, section 28, subdivision (b)(13) of the California Constitution states, "In order to preserve and protect a victim's rights to justice and due process, a victim shall be entitled to the following rights: To restitution." This constitutional right is codified in section 1202.4, subdivision (f) which states in relevant part, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any

22

other showing to the court." (§ 1202.4, subd. (f).)  Section 1202.4, subdivision (f)(3) provides a laundry list of qualifying losses such as:  (1) items stolen or damaged, (2) medical expenses, (3) mental health counseling, (4) lost wages etc.  (*Id.*, subd. (f)(3)(A)-(D).)  "A defendant's inability to pay shall not be a consideration in determining the amount of a restitution order."  (*Id.*, subd. (g).)  "A restitution order imposed pursuant to subdivision (f) shall be enforceable as if the order were a civil judgment."  (*Id.*, subd. (i).)

As can be observed, a victim's constitutional right to restitution under the California Constitution as implemented through section 1202.4, subdivision (f) is neither a "fine" nor a payment to a "sovereign."  Unlike a fine which is normally determined by the legislative branch as punishment, the amount of direct victim restitution is set based on the amount claimed by the victim.  (§ 1202.4, subd. (f).)  The payment is not made to the state of California or to any governmental entity but is instead paid to the victim, with one exception.  (*Ibid*.)  When a victim has received payment for restitution from the California Victim Compensation Board, as in this case, the amount of loss is paid to the Restitution Fund.  (*Id.*, subd. (f)(2).)  We do not see this exception as changing the legal nature of direct victim restitution as a victim's constitutional right to be made financially whole for losses stemming from criminal activity.

Among other cases, appellant relies on *Timbs v. Indiana* (2019) __ U.S. __ [139 S.Ct. 682], and *Austin v. United States* (1993) 509 U.S. 602 (*Austin*) and contends the payment of direct victim restitution is a "fine" as contemplated by the Excessive Fines Clause.  Both *Timbs* and *Austin* were civil asset forfeiture cases instituted after a criminal conviction.  *Timbs* was published to incorporate the Excessive Fine Clause as applicable against

23

the states through the Fourteenth Amendment. (*Timbs,* at pp. 689-690.)

In *Austin*, the United States government argued that the Excessive Fines Clause did not apply to "a civil proceeding unless that proceeding is so punitive that it must be considered criminal" under the decisional laws of the United States Supreme Court. (*Austin, supra,* 509 U.S. at p. 607.) The *Austin* court explained, "the question is not, as the United States would have it, whether forfeiture under [the applicable statute] is civil or criminal, but rather whether it is punishment." (*Id.* at p. 610.) The *Austin* court noted that sanctions sometimes serve more than one purpose, and that " 'a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.' " (*Ibid.*)

To establish that payments of restitution to the victim is "punishment," appellant cites *People v. Allen* (2019) 41 Cal.App.5th 312 (*Allen*) which, on the relevant point, cited *People v. Guillen* (2013) 218 Cal.App.4th 975 (*Guillen*). *Guillen* dealt with the question whether trial courts have the authority to suspend restitution fines ordered under section 1202.4, subdivision (b) and answered in the affirmative. (*Guillen,* at p. 998.) Before arriving at its holding, *Guillen* discussed the difference between the restitution fine and direct victim restitution by explaining that "[t]he purposes of the two kinds of restitution are different. The imposition of a restitution fine is punishment. [Citation.] The purpose of direct victim restitution, however, is to reimburse the victim for economic losses caused by the defendant's criminal conduct, i.e., to make the victim

24

reasonably whole.  [Citations.]  Secondary goals of direct restitution include rehabilitation of the defendant and deterrence of future criminality.  [Citation.]"  (*Id.* at p. 984.)  Seizing on the discussion of the secondary goals as recognized in California's appellate decisions, appellant argues that direct victim restitution, based on the *Austin* standard, is subject to the Eighth Amendment's proscription against the imposition of excessive fines.[5]

We are not convinced for several reasons.  First, *Allen* and *Guillen* did not address whether direct victim restitution constitutes "punishment" for purpose of the Excessive Fines Clause.  Second, while one of the four-part analysis under the Excessive Fines Clause asks whether the defendant has the ability to pay the sanction, direct victim restitution is to be ordered regardless of the defendant's ability to pay.  (See § 1202.4, subd. (g).)  Third, the amount of direct victim restitution

---

[5]     In discussing the goals of direct victim restitution, *Guillen* cited *People v. Jennings* (2005) 128 Cal.App.4th 42, which addressed whether a trial court is vested with authority to offset its direct victim restitution order by the amount of an insurance settlement payment made to the victim by a defendant who was an insured, but did not obtain the insurance himself.  In a two-one decision, the majority held that the defendant was entitled to an offset for amounts paid by his insurance company for the victim's medical expenses.  (*Id.* at pp. 55-57.)  While recognizing that California's decisional law has acknowledged that rehabilitation and deterrence serve as additional goals in ordering a defendant to pay victim restitution, the majority noted that "the primary purpose of victim restitution is to fully reimburse the victim for his or her economic losses."  (*Id.* at p. 57.)

is not determined through independent governmental action, but instead by the amount claimed by the victim.  (*Id*., subd. (f).)  Furthermore, the payment of direct victim restitution is not made to the "sovereign," but instead, to the victim as compensation for economic loss suffered from criminal activity.

*Browning-Ferris* concerned whether the Excessive Fines Clause applied to punitive damage awards in a suit between private individuals.  There, the court noted, "even if we were prepared to extend the scope of the Excessive Fines Clause beyond the context where the Framers clearly intended it to apply, we would not be persuaded to do so with respect to cases of punitive damages awards in private civil cases, because they are too far afield from the concerns that animate the Eighth Amendment.  We think it clear, from both the language of the Excessive Fines Clause and the nature of our constitutional framework, that the Eighth Amendment places limits on the steps a government may take against an individual, whether it be keeping him in prison, imposing excessive monetary sanctions, or using cruel and unusual punishments." (*Browning–Ferris*, *supra*, 492 U.S. at p. 275.)  Like punitive damage awards, direct victim restitution is too far afield from the concerns that animate the Eighth Amendment.  As such, we decline to hold direct victim restitution under section 1202.4, subdivision (f) is subject to the Excessive Fines Clause of the Eighth Amendment.

## DISPOSITION

The judgment is affirmed.

OHTA, J.[*]

We concur:

BIGELOW, P. J.

STRATTON, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.